# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**UNITED STATES OF AMERICA,**

**Plaintiff**

**-vs-** **Case No. 2:06-cr-81-FtM-29DNF**

**FREDERICK HUNTER and MICHAEL MITCHELL,**

**Defendants.**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO SUPPRESS EVIDENCE (Doc. No. 25)** |
| **FILED:** | **September 1, 2006** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED** as to Frederick Hunter and Michael Mitchell.

The Defendant, Frederick Hunter ("Hunter") requests that the Court suppress all evidence that was derived from the search of his vehicle and any statements that he made based upon the stop of the vehicle being illegal, and his detention being unlawful. The Co-Defendant, Michael Mitchell ("Mitchell") moved to adopt the Motion to Suppress Evidence which the Court granted by Order (Doc. 35). Unless otherwise specified, this Report and Recommendation shall apply to both Defendants. The Defendants are charged with knowingly possessing with intent to distribute a detectable amount of

cocaine in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(C), and 18 U.S.C. §2. An evidentiary hearing was held on September 21, 2006.

**I. Testimony and Evidence**

The Government presented the testimony of Trooper Joseph Gideons and Trooper Michael Grider who are both employed by the Florida Highway Patrol. The Defendants did not present any testimony, however, they did introduce evidence.

**A. Trooper Gideons' Evidence**

Trooper Gideons has been employed by the Florida Highway Patrol for ten years. (Tr[1]. p. 5). He is a felony officer and is involved in the contraband interdiction program which is a program where troopers look for criminal activity in addition to enforcing traffic laws. (Tr. p. 5-6). Trooper Gideons received additional training in the area of illegal narcotics. (Tr. p. 6). Part of his duties include conducting traffic stops for infractions of traffic laws. (Tr. p. 6).

On February 10, 2006, Trooper Gideons was on duty for regular traffic enforcement as well as watching for criminal activity at 4:00 p.m. on Highway 29. (Tr. p. 7). Trooper Gideons testified that Highway 29 was known to be used by drug traffickers going to and from Miami to Southwest Florida. (Tr. p. 7). Drug traffickers use Highway 29 to avoid the major highways. (Tr. p. 7-8).

At approximately 4:15 p.m., Trooper Gideons saw a Ford Expedition passing him with very dark tinted windows. (Tr. p. 8). The vehicle was not speeding. (Tr. p. 8-9). Trooper Gideons

---

[1] "Tr." refers to the transcript of the evidentiary hearing held on September 21, 2006. (Doc. 39).

activated his lights and attempted to stop the Expedition, which slowed but did not stop at first. (Tr. p. 8, 10). Eventually, the Expedition did pull to a stop. (Tr. p. 10). The Expedition had temporary tags. (Tr. p. 10). After it stopped, Trooper Gideons approached the driver's door and greeted the driver who was the Defendant, Michael Mitchell. (Tr. p. 10, 11). He explained to the driver that he stopped the vehicle due to the window tinting being too dark. (Tr. p. 10). Trooper Gideons asked Mitchell for his license and registration. (Tr. p. 10). Mitchell's hands were shaking. (Tr. p. 11). From the driver's window, Trooper Gideons smelled a strong odor of air freshener, and knew that air freshener was used to suppress the odor of illegal drugs. (Tr. p. 11-12). Trooper Gideons also noticed that the passenger, Defendant Frederick Hunter did not make eye-contact with him. (Tr. p. 12).

Trooper Gideons asked Mitchell to exit the vehicle and move toward the patrol car. (Tr. p. 12). They stood outside the patrol car for Trooper Gideons' safety. (Tr. p. 12). Trooper Gideons called in the traffic stop and also checked Mitchell's driver's license. (Tr. p. 12). Within minutes after the stop, Trooper Gideons called for a K-9 Officer for back up. (Tr. p. 12, 13). Some of the reasons that he called for back up were that it was a rural area, there were two people in the vehicle, the driver was nervous, the passenger would not make eye-contact, and there was a strong smell of air freshener. (Tr. p. 13).

Trooper Gideons began to issue a warning for the window tint on the front windshield. (Tr. p. 13). He explained that there was tint on the front windshield, and Mitchell argued with him, claiming there was no tint on the front windshield and that the windows were tinted when he purchased the vehicle. (Tr. p. 14). Trooper Gideons also determined that the tint on the side windows was too dark. (Tr. p. 15). He explained the he knew the window tint was too dark based upon his experience. (Tr.

p. 15). He also carries a tint meter with him. (Tr. p. 15). Trooper Gideons decided to issue a citation for the side window tint. (Tr. p. 14).

While Trooper Gideons waited for the driver's license check to be completed, which takes a few minutes, he asked Mitchell if his driver's license was suspended, if he had been arrested, and his criminal history. (Tr. p. 15). Trooper Gideons conducted a criminal history check on Mitchell. (Tr. p. 15).

While standing with Mitchell, Trooper Gideons observed that Mitchell was nervous and kept looking at the Expedition. (Tr. p. 15, 16). Mitchell's respiration became more rapid, and his answers to questions became very short. (Tr. p. 15-16). It appeared to Trooper Gideons that Michell wanted to leave. (Tr. p. 16).

Trooper Gideons asked Mitchell where he was going and where he came from. (Tr. p. 17). Michell responded that he was coming from college in Miami and going to his home in Cape Coral. (Tr. p. 17). Trooper Gideons asked Mitchell about Hunter's plans. (Tr. p. 17). Mitchell said that Hunter was a family friend visiting him at college, but that Hunter had come from Houston, Texas. (Tr. p. 17). He said that Hunter's girlfriend drove Hunter from Houston to Miami, and Mitchell was taking Hunter to Cape Coral to visit Mitchell's family. (Tr. p. 17).

Trooper Gideons approached the Expedition on the passenger side of the vehicle. (Tr. p. 18). He asked Hunter for his license. (Tr. p. 18). Hunter acted very cocky and made no eye-contact. (Tr. p. 18). The address on his driver's license was a Fort Myers' address. (Tr. p. 18). Trooper Gideons used his tint meter on the passenger side window and found that the reading was 7%. (Tr. p. 20). The tint meter was certified to be accurate, and the minimal legal reading is 28% light transmittance. (See,

Gov. Exh. 1, showing a picture of the tint meter reading on the Expedition, Tr. p. 19). Trooper Gideons showed the tint meter to Hunter and explained it to him. (Tr. p. 20).

Trooper Gideons asked Hunter about his trip. (Tr. p. 20-21). Hunter said that he was hanging out with Mitchell and that he rode to Miami with Mitchell and was returning with him. (Tr. p. 21). Trooper Gideons asked if Hunter had been in trouble with the law before and Hunter responded, "Run me." (Tr. p. 21-22). Trooper Gideons recognized that the stories concerning this trip that were given by Mitchell and Hunter were conflicting. (Tr. p. 21). In his mind, Trooper Gideons thought that Hunter and Mitchell were not being truthful and they were participating in a deception. (Tr. p. 21). Trooper Gideons checked Hunter's driver's license as well. (Tr. p. 21). He began to write the citation for the window tint on the side windows. (Tr. p. 22).

Mitchell had a valid driver's license and had a criminal history. (Tr. p. 22). Hunter also had a criminal history and when Trooper Gideons asked him about it, Hunter said that it was not him. (Tr. p. 22-23). Trooper Gideons had the dispatcher recheck Hunter's social security number, and verified that the information received was Hunter's criminal history. (Tr. p. 23).

Trooper Gideons then asked Mitchell for consent to search the Expedition. (Tr. p. 23). Mitchell hesitated and said that he did not understand about consenting to search. (Tr. p. 24). Trooper Gideons explained about the search and Mitchell refused consent. (Tr. p. 24). He asked Mitchell if he had guns, illegal drugs or money in the vehicle. (Tr. p. 24).

As Trooper Gideons was finishing writing the citation for the window tint, Trooper Grider appeared. Trooper Gideons estimated that Trooper Grider appeared fifteen to twenty minutes after the stop began. (Tr. p. 24, 25). Trooper Gideons told Trooper Grider that Mitchell had denied consent to search, and Trooper Gideons asked Trooper Grider to conduct a free air search of the

vehicle with his K-9. (Tr. p. 24-25). Trooper Gideons asked Hunter to exit the vehicle for safety reasons. (Tr. p. 25). Trooper Grider told Trooper Gideons that the dog alerted on the vehicle. (Tr. p.. 25). A search was conducted of the vehicle and narcotics were located. (Tr. p. 26). The Defendants were arrested, given their *Miranda* rights, and placed in the back seat of the patrol car where they proceeded to make incriminating statements which were surreptitiously recorded. (Tr. p. 26). A transcript of the statements was introduced. (Gov. Exh. 2). On page 3, the Defendants discussed how Mitchell was nervous. (Gov. Exh. 2, p. 3). On page 4, the Defendants discussed the stories that they told the troopers during questioning. (Gov. Exh. 2, p. 4).

On cross-examination, counsel for Hunter showed Trooper Gideons three reports that Trooper Gideons completed. (Def. Exh. A, B, and C). In Defense Exhibit A, Trooper Gideons indicated that Mitchell told him that Hunter lived in Houston, but had gotten a ride to Miami from Hunter's pregnant girlfriend and was in Miami visiting her. (Def. Exh. A, p. 2). Mitchell told Trooper Gideons that he was taking Hunter back to Cape Coral to see Mitchell's parents. *Id*. In this same report, Trooper Gideons wrote that Hunter said he had rode to Miami with Mitchell, hung out with him there, and was heading home. *Id*. In the next report, Trooper Gideons wrote that Mitchell told him that Hunter was a friend who had gotten a ride to Miami earlier with his girlfriend and Mitchell was taking him back to visit Mitchell's parents. (Def. Exh. B, p. 3). In the second report, Trooper Gideons wrote that Hunter told him that he had ridden to Miami with Mitchell, hung out with him there, and was now returning. *Id*. In the third report, Trooper Gideons wrote that Michell told him that Hunter was from Houston and that Hunter had gotten a ride to Miami from his girlfriend and that Mitchell was taking him to visit his parents. (Def. Exh. C, p. 3). Hunter said that he rode to Miami with Mitchell, they hung out, and he was returning home. *Id*.

**B. Trooper Grider's Testimony**

Trooper Grider testified that he has been employed with the Florida Highway Patrol since 1994, and has been a K-9 handler since 1998. (Tr. p. 74). Trooper Grider works Highway 29 often. (Tr. p. 84). He testified that it is a normal route for drug traffickers from Miami to use. (Tr. p. 84). He has gone through extensive drug training to be a K-9 handler. (Tr. p. 74). His dog is trained to detect contraband and the dog's certifications are current. (Tr. p. 75-6). His dog uses an aggressive alert when contraband is present. (Tr. p. 76). An aggressive alert is a scratch or a bite. (Tr. p. 76).

On February 10, 2006, Trooper Grider was on duty at 4:00 p.m. on Alligator Alley. (Tr. p. 77). At approximately 4:17 p.m. he received a call on his Nextel telephone from Trooper Gideons to assist. (Tr. p. 78). He arrived at the scene at approximately 4:38 p.m. (Tr. p. 78).

At the scene, he saw Trooper Gideons and a car stopped in front of the patrol car. (Tr. p. 78). Trooper Gideons was outside of his patrol car, and another person was standing with him. (Tr. p. 78). Trooper Gideons was in the process of writing a citation. (Tr. p. 79). Trooper Grider approached Trooper Gideons who asked him to perform a free air sniff. (Tr. p. 79). Trooper Gideons had the passenger exist the vehicle, and Trooper Grider's dog began the free air sniff. (Tr. p. 79).

Trooper Grider determined the way the wind was blowing, and based on his determination, began the free air sniff at the front of the car proceeding counterclockwise. (Tr. p. 79-80). The dog sniffed all of the car seams and at the driver's door his behavior had an overt change and he scratched an alert on the driver's door seam. (Tr. p. 80). Trooper Grider continued the free air sniff, and the dog went on its hind legs to sniff the interior of the vehicle. (Tr. p. 80-1). The exterior search of the vehicle lasted approximately 2 minutes. (Tr. p. 99).

The dog entered the vehicle and alerted on the center consol and the glove box. (Tr. p. 83). Trooper Grider as well as another officer searched the Expedition and found cocaine behind the glove box, and cocaine and marijuana in the center consol. (Tr. p. 83).

**C. Evidence Presented by Defense**

The Defense presented a copy of a compact disc with the Florida Highway Patrol Log from 3:00 p.m. to 5:00 p.m. on February 10, 2006. (Def. Exh. H). At 4:15, p.m. and 4:23 p.m., two calls were recorded from Trooper Gideons calling in a drivers' license numbers. (Def. Exh. H). At 4:19 p.m. and 4:26 p.m. information regarding the Defendants' drivers licenses and criminal histories were relayed to Trooper Gideons. (Def. Exh. H). At 4:38 p.m. Trooper Grider called in stating that he had arrived at the scene. (Def. Exh. H).

**II. Analysis**

The Defendants argue that the initial stop of the vehicle was unlawful and the subsequent detention of the Defendants was unlawful as well, and therefore, all evidence seized and statements made by the Defendants relating to this stop should be suppressed.

**A. Probable Cause to Stop the Vehicle**

The Fourth Amendment provides protections to individuals from unreasonable searches and seizures by government officials, and this protection extends to investigatory stops of people or vehicles. *United States v. Johnson*, 2006 WL 2337741, *2 (11th Cir. 2006), (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). A stop of an automobile by police, even if only for a brief period

of time and for a limited purpose constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996), citations omitted. A traffic stop must not be "unreasonable" under the circumstances. *Id*. at 810. A decision to stop a vehicle is reasonable when the officer has probable cause to believe a traffic violation occurred. *Id*.

In the instant case, Trooper Gideons saw the Expedition and determined from his experience that the window tinting violated the law. Trooper Gideons stopped the vehicle based upon his observations. He took a tint meter reading and found that the light transmittance was 7% for the side windows. He also observed the front windshield was tinted. Pursuant to Fla. Stat. §316.2953, a side window must have a light transmittance of "at least 28% in the visible light range." The window tinting on the Expedition's side windows violated the law. Further, pursuant to Fla. Stat. §316.2952 (2), with limited exception, the front windshield of a vehicle may not have sunscreening material on it. Trooper Gideons determined that the front windshield had illegal tinting on it in violation of the law. The Court determines that Trooper Gideons had probable cause to stop the vehicle based upon his observations concerning the windows.

**B. The Length of the Stop**

The Defendants argue that the length of the stop was illegal. The length of a traffic stop must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Frazier*, 2006 WL 2456588, *6 (11th Cir. 2006) (citing *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003)).

**1. Reasonable Suspicion**

An officer must have articulable suspicion for the traffic stop to last longer than necessary to effectuate the purposes of the traffic stop. *Frazier*, 2006 WL 2456588 at *6, (citing *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)). Officers must be able to indicate specific facts which taken together with "'rational inferences from those facts, justify a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *United States v. Simmons*, 172 F.3d 775, 778-79 (11th Cir. 1999) (citing *United States v. Hardy*, 855 F.2d 753, 757 (11th Cir. 1988)). Reasonable suspicion is less than probable cause but must be more than a general suspicion or hunch. *Id.* at 779. Although officers may not detain suspects longer than necessary without articulable suspicion, officers do have a duty to investigate suspicious circumstances that are brought to their attention. *Id.*, (citing *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991)).

Trooper Gideons saw the Expedition and determined that the windows were tinted in violation of the law. The Expedition slowed down, but it took some time for it to fully stop. This behavior was suspicious to Trooper Gideons. He knew that Highway 29 was used by drug traffickers. Trooper Gideons noted that the driver was nervous with shaky hands, and the passenger was cocky but would not make eye-contact with the officer. There was a heavy smell of air freshener emanating from the vehicle which was also suspicious. Mitchell continued to act nervously with rapid respiration after he knew that the violation was only for window tinting. Mitchell's story concerning Hunter conflicted with Hunter's story concerning his recent travels which was suspicious. Hunter would not make eye-contact with Trooper Gideons. Trooper Gideons noted that Hunter's drivers license had a Fort Myers address rather than a Houston address. Hunter claimed that the criminal history that Trooper Gideons had was not his, but Trooper Gideons rechecked the numbers and it was Hunter's criminal history.

Trooper Gideons had suspicions that these suspects were not being truthful and were attempting to deceive him. Taken together, Trooper Gideons made rational inferences which justify a reasonable and articulable suspicion that these Defendants were engaged in criminal activity.

**2. Length of Stop**

Having found that Trooper Gideons had reasonable suspicion that the Defendants were engaging in criminal activity, the Court must determine if the length of the stop was illegal. A court may look to whether the officers' purposes are served by the detention, the diligence of the officers in pursuing the investigation, the scope and intrusiveness of the detention, and the length of the detention. *Simmons*, 172 F.3d at 780. Absent articulable suspicion of other illegal activity, a stop may not last longer than necessary "'to process the traffic violation.'" *United States v. Frazier*, 2006 WL 2456588 * (11th Cir. 2006) (citing, *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). Courts have determined that 30-minute and 50-minute investigative stops were not excessive under the circumstances, but a 90-minute stop was probably too long. *Id*. at 780 (citing *Hardy*, 855 F.2d at 761, and *United States v. Place*, 462 U.S. 696, 709 (1983)). If a traffic stop is of a longer duration, then extenuating circumstances must be present to justify the additional detention. *Id*.

Officers are "'entitled under the decisional law to conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car *and* running a computer check for outstanding warrants.'" *Frazier,* 2006 WL 2456588 at *6, (citing *Simmons*, 172 F.3d at 778 and *Purcell*, 236 F.3d at 1278)). Officers may take the steps necessary to protect their personal safety which include conducting protective searches of the driver and passengers.

*Purcell*, 236 F.3d at 1277. The knowledge of the criminal histories of the occupants of the vehicle is often relevant to the safety of the officer. *Id*. at 1278 (citing *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997)) (other citations omitted).

The issue in the instant case is whether, based upon all of the circumstances that the Troopers faced, the length of the stop was constitutionally reasonable. Trooper Gideons stopped the Expedition at approximately 4:15 p.m. for illegally tinted windows. It took the vehicle a little while to actually pull to a stop. Trooper Gideons went to the driver's side of the Expedition, greeted the driver and explained that the window tinting was in violation of the law. He asked the driver for his license and registration. He took a moment to observe the passenger. He asked Mitchell to exit the vehicle, walked with Mitchell to the patrol car, and at 4:15 p.m. called into dispatch to check Mitchell's license. He used his cellular telephone to call for back up. Mitchell argued with Trooper Gideons about the window tint telling Trooper Gideons that the car had come with the tint already on the windows. While he waited for the license check to come back, he asked Mitchell if his license was suspended and his criminal history. Trooper Gideons conducted a criminal history check on Mitchell. He asked Mitchell about his plans and Hunter's plans.

Trooper Gideons then went to the Expedition asked Hunter for his license and conducted the tint meter test. He asked Hunter about his trip. He explained the tint meter to Hunter. Trooper Gideons returned to his vehicle and at 4:23, p.m. called dispatch to check Hunter's drivers license. At 4:26 p.m., the information came back on Hunter's drivers license. Trooper Gideons asked Hunter about his criminal history and Hunter denied it was him. Trooper Gideons asked dispatch to recheck the criminal history. At 4:38, Trooper Grider arrived on the scene, had his dog perform the free air

sniff, and then searched the vehicle. Trooper Gideons had not completed writing the warning and citation at the time Trooper Grider appeared.

The length of the detention must last only as long as necessary to effectuate the purposes of the traffic stop. *Frazier*, 2006 WL 2456588 at *6. Until a minute or two after 4:26 p.m. which is the time that Trooper Gideons verified Hunter's criminal history, Trooper Gideons was effectuating the purposes of the traffic stop. He verified the suspects drivers licenses and checked their criminal history which is permissible. He spoke with them and took the appropriate meter reading. Arguably, after the drivers license and criminal history information were verified, Trooper Gideons should have been able to complete the citation and warning and the Defendants should have been free to leave. However, the Court has determined that Trooper Gideons had reasonable suspicion that the Defendants were engaging in criminal activity, and therefore, it is permissible for the traffic stop to last longer than is necessary solely to effectuate the purposes of the traffic stop. *See, Frazier*, 2006 WL 2456588 at *6.

At most, the traffic stop lasted an additional 12 minutes from the time that Trooper Gideons received the criminal history check on Hunter to the time that Trooper Grider appeared on the scene and conducted the free air search. The free air search lasted approximately 2 minutes. The Court determines that an approximate 15 minutes of time when an officer has reasonable suspicion that criminal activity is occurring is not an excessive amount of time, and the stop in the instant case was of a legal duration.

**III. Conclusion**

Based upon the totality of the circumstances, the Court determines that the initial stop and the length of the stop were lawful. The Court respectfully recommends that the Motion to Suppress Evidence (Doc. 25) be denied as to Frederick Hunter and as to Michael Mitchell.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this 26th day of October, 2006.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:

All Parties of Record